**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ASHOK ARORA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-cv-6109 |
| v. | ) | |
| | ) | Judge Marvin E. Aspen |
| MIDLAND CREDIT MANAGEMENT, | ) | |
| INC. and MIDLAND FUNDING LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Defendants Midland Credit Management ("Midland") and Midland Funding LLC

("Funding") move for summary judgment on all claims. (Dkt. No. 83.)[1] At many points

throughout his responses, Plaintiff Ashok Arora, who is proceeding *pro se*, requests leave to take

more discovery, which we construe as a motion for leave to reopen discovery. For the following

reasons, we grant Defendants' motion for summary judgment as to Funding and grant in part and

deny in part as to Midland. We deny leave to reopen discovery.

**BACKGROUND**

**I.     Facts Considered**

Before we delve into the facts of this dispute, we must explain how the factual record is

established at summary judgment. On a motion for summary judgment, we must determine

whether there is a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "A fact is

'material' if it is one identified by the law as affecting the outcome of the case." *Nat'l Am. Ins.*

---

[1] For ECF filings, we cite to the page number(s) set forth in the document's ECF header unless
citing to a particular paragraph or other page designation is more appropriate.

*Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 722 (7th Cir. 2015). Federal Rule of Civil Procedure 56 dictates how we determine which material facts are genuinely disputed. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56 specifies that when proving a fact through affidavit or declaration, the "affidavit or declaration . . . must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," we may, among other options, consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e).

The parties object to us considering many of each other's statements of fact at this stage because they rely on evidence that could not be introduced in admissible form at trial. (Plaintiff's Local Rule 56.1(b)(2) Response to Defendants' Local Rule 56.1 Statement of Material Facts ("Response to SOF") (Dkt. No. 92) ¶¶ 8–12; Defendants' Responses to Plaintiff's Local Rule 56.1(b)(3) Statement of Additional Material Facts ("Response to SOAF") (Dkt. No. 102) ¶¶ 2–4, 7, 11, 17–30, 32–38.) In the main, we agree with Defendants that Arora has relied on inadmissible evidence and reject Arora's objections to Defendants' evidence.

First, Arora relies on some documents he found on the internet with defects that would prevent him from using them at trial. For one, he could not authenticate these documents under Federal Rule of Evidence 901, and we therefore cannot consider them at summary judgment.

*Scott v. Edinburg*, 346 F.3d 752, 759–60 (7th Cir. 2003) (documents that cannot be authenticated are "inadmissible and cannot be considered for purposes of summary judgment"). When Midland identified this problem in its reply brief, (Defendants' Reply in Support of Their Motion for Summary Judgment ("Reply") (Dkt. No. 101) at 3–4), Arora merely re-filed the same documents with prefaces explaining where on the internet he retrieved them. (Plaintiff's Sur-Reply in Opposition to Defendants' Motion for Summary Judgment ("Sur-Reply") (Dkt. No. 105) at 2–4.) But this does not cure the authenticity issue; with the information he provided, Arora establishes, at most, that these documents appear somewhere on the internet, not that they are what they purport to be. Fed. R. Evid. 901(a); *Silversul Indus., Inc. v. PPG Indus., Inc.*, 296 F. Supp. 3d 936, 943 n.5 (N.D. Ill. 2017) ("[W]ebsites . . . must generally pass muster under . . . Rule 901 . . . ."); *Pryor v. City of Chicago*, 726 F. Supp. 2d 939, 943–44 (N.D. Ill. 2010) (refusing to consider on summary judgment documents for which only authentication was from a person who "had no personal knowledge as to their source or authorship").

Moreover, even if Arora could authenticate the documents, he seeks to introduce them to establish the truth of their contents, making them all hearsay with no applicable exception. Fed. R. Evid. 801; *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."). We therefore do not consider Exhibit 6 (a purported proposal from Noble systems), Exhibit 8 (a purported excerpt of a manual on the ATOMIX database), or Exhibit 15 (a purported printout of a Navy Federal Credit Union website) to Arora's statement of additional facts; or Exhibit 4 (a purported printout of a WebMD page) or Exhibit 5 (same) to Arora's response to Defendants' statement of facts.

Second, the parties object to some facts in party declarations. Where those factual propositions fall within the party's personal knowledge—such as what the other side of a phone

call sounded like, how the declarant's body felt, or how much work experience the declarant has—the declaration is competent evidence. Fed. R. Evid. 602; (*e.g.*, Exhibit 13: Declaration of Plaintiff ("Arora Dec.") (Dkt. No. 99-13) ¶ 7 (Arora heard "dead qui[et]" on the other end of 22 phone calls); *id.* ¶ 16 (Arora had trouble sleeping from December 2013 to July 2014); *id.* ¶ 25 (Arora stopped taking blood pressure medication in 2020); *id.* ¶ 27 (Arora has over 20 years of experience working with relational databases).) For the same reason, where Defendants' declarations are based on their authorized agent's personal knowledge after reviewing business records (or lack thereof), the statements at issue can be considered. (Declaration of Midland Credit Management, Inc. ("Midland Dec.") (Dkt. No. 85) at 11 ¶ 2 ("I have access to and routinely review records maintained by [Midland]. I am authorized to make this affidavit on behalf of [Midland]. The statements made in this Affidavit are based on my personal knowledge after review of [Midland's] business records."); *Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 921 (N.D. Ill. 2014) (allowing corporate representative declaration at summary judgment); *see also* Fed. R. Evid. 803(6)–(7) (creating exceptions to hearsay rule for both presence and absence of business records). But where Arora's declaration relies on hearsay—relaying third-party, out-of-court statements for their truth—we do not consider them here. Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 802; (*e.g.*, Arora Dec. ¶ 22 (declaring that "Another collection agency . . . disclosed . . . that . . . Elizabeth Adams . . . was born in the year 1989" to prove that Adams was born in 1989); *id.* ¶ 28 (declaring that a doctor told Arora his blood pressure was normal to prove that Arora's blood pressure was normal).)

Third, Arora attempts to extrapolate from some of the admissible facts about Midland's dialing technology by offering his own expert interpretation of those facts based on his private experimentation with a database and theoretical understanding of relational databases.

(Plaintiff's Local Rule 56.1(b)(3) Statement of Additional Material Facts ("SOAF") (Dkt. No. 99) ¶¶ 33–37.)  Arora argues that although the manual in the record describing this technology ("Noble Manual") does not discuss or contemplate the use of a "random or sequential number generator" at any point, it has the capacity to use one.  (Plaintiff's Response and Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Opp.") (Dkt. No. 100) at 5–9.)  In his statement of additional facts, Arora hypothesizes without citation to anything in the record that the technology's database could produce sequential numbers if the user follows a seven-step process of Arora's creation to (1) manually input sequential numbers into a database (SOAF ¶ 36); or (2) enter a single number in the database and fill in subsequent entries with the number 0, causing the database to generate sequential numbers.  (*Id.* ¶ 37.)  Arora insists that his theoretical approach is valid because he has "over twenty . . . years of experience working with relational databases including INFORMIX."  (*Id.* ¶ 33.)  Defendants object to these purported facts, arguing that Arora "is not an expert on dialing technology, and his lay opinions and conclusions are . . . inadmissible" and observing that Arora "cites no source of authority" for his sequential-number-generation theories.  (Response to SOAF ¶¶ 29, 36–37.)  In Arora's Sur-Reply, he submits for the first time a document purporting to show that his theoretical, seven-step manipulations of the databases work in practice, too.  (Exhibit 23: Sequential Number Generation Test Results ("Arora Expert Summary") (Dkt. No. 105-8) at 2–5.)

We do not doubt Arora's skill and experience.  (*E.g.*, Exhibit D: Deposition of Ashok Arora ("Arora Dep.") (Dkt. No. 85) at 19 (describing Arora's prestigious educational background).)  But Arora offered no evidence to support the additional factual statements at issue before surprising Defendants with his private and undisclosed experimentation in his Sur-Reply.  (SOAF ¶¶ 36–37; Sur-Reply at 10–11; Arora Expert Summary at 2–5.)  We therefore

conclude that Arora forfeited the chance to adduce factual support to paragraphs 36 and 37 of his statement of additional facts and do not consider Arora's Exhibit 23. *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.").

Moreover, there is no indication that Arora disclosed himself as an expert during discovery in compliance with Federal Rule of Civil Procedure 26(a)(2). By failing to disclose himself as an expert, Arora has prevented Defendants from probing his qualifications or the relevance or reliability of his analysis under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702. We therefore will not consider Arora's putatively expert opinions or documents describing Arora's experimental methodology in our analysis. Finally, because Arora could not offer the same opinions as a lay opinion witness, *see* Fed. R. Evid. 701(c) (requiring that lay opinions are "*not* based on scientific, technical, or other specialized knowledge"); (*cf.* Motion for Leave to File Sur-Reply (Dkt. No. 103) ("Plaintiff is not a lay witness when it comes to software")), we do not consider any of Arora's opinions about how the Noble database could be manipulated to sequentially generate numbers.

With these principles in mind, we now describe the competent evidence in the record in the light most favorable to Arora, the nonmovant, and drawing all reasonable inferences in his favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013)

## II. Factual Background

Funding purchases delinquent debts, and Midland services those debts. (Response to SOF ¶¶ 1, 3.) Midland has stipulated for this litigation that it was a "debt collector" under the Fair Debt Collection Practices Act ("FDCPA") at the relevant times of this dispute. (Stipulation

(Dkt. No. 76) at 1.)  Funding does not service its own accounts or attempt to collect its own debts, and there is no evidence that Funding interacted with Arora in any way.  (*Id.* ¶¶ 3–6.)

Midland, however, called Arora's cell phone 240 times between December 2013 and July 2014.  (Response to SOAF ¶ 6; Arora Dec. ¶ 10 (establishing that Midland placed the calls).)  On a few occasions, Arora called back and heard an automated greeting identifying the phone number as Midland's.  (SOAF ¶ 7; Arora Dec. ¶¶ 6, 10–11.)

Midland placed the calls to Arora using dialing system technology developed by Noble Systems, Inc. ("Noble").  (Response to SOF ¶ 7; Response to SOAF ¶ 30.)  As relevant here, the Noble system used "predictive dialing," wherein users could select telephone numbers from a database, Noble's dialer could call those numbers automatically, and the system would assign an agent to the call only after Noble's technology recognized that the call had been answered. (Response to SOAF ¶ 30; Exhibit 5: Deposition of MCM's Charla Johnson ("Midland Dep.") (Dkt. No. 99-5) at 4–5); Exhibit 3: Midland's Written Description of Dialing Technology (Redacted) ("Written Description") (Dkt. No. 99-3) at 3.)  The phone numbers the Noble system called were originally input manually into a database along with information like names, accounts, and other information associated with the phone number.  (SOAF ¶ 35; Midland Dep. at 11–12; Exhibit 7: Noble Dialer Maestro Manual Vol. 2 ("Noble Manual") (Dkt. No. 99-7) at 128–29.)  Users then could manually define groupings of entries, or "tables," from within that database.  (SOAF ¶ 35(c)–(d); Noble Manual at 128–38.)  Using data from their preselected tables, users then could create "calling lists," also called "campaigns," to cause the dialer to dial those numbers.  (SOAF ¶ 35(e)–(g); Noble Manual at 128–38.)  This process never involved the use of a random or sequential number generator, as its purpose was to reach debtors at specific phone numbers to collect debts.  (Response to SOAF ¶ 35; Written Description at 2.)

Arora never consented to Midland's calls.  (Response to SOAF ¶ 13.)  Nor is there anything in the record to suggest that Arora owed any debt for which Midland might be calling him.  Rather, it appears that Midland placed hundreds of calls to Arora trying to reach Elizabeth Adams, who is unknown to and unaffiliated with Arora.  (Response to SOAF ¶¶ 8–9; Arora Dec. ¶ 11.)  Years before the calls at issue, Arora's phone number belonged to Adams.  (Response to SOAF ¶ 12.)

There is little information about Adams in the record.  According to Midland's business records, Adams originally incurred a debt to Navy Federal Credit Union, which sold the debt to Asset Acceptance, LLC, which then sold it to Funding.  (Defendants' Local Rule 56.1 Statement of Material Facts ("SOF") (Dkt. No. 85) ¶ 10; Midland Dec. at 12 ¶ 4.)  Neither Midland nor Funding has any record of the types of charges that gave rise to Adams's debt to Navy Federal Credit Union.  (Midland Dec. ¶¶ 4–5; Declaration of Midland Funding, Inc. ('Funding Dec.") (Dkt. No. 85) at 15 ¶¶ 4–5.)

Although Arora explained that he was not Adams and even threatened legal action against Midland over the phone, the wrong-number debt-collection calls did not abate. (Response to SOAF ¶¶ 2–3, 7.)  To the contrary, Arora believed that the timing of the calls revealed that Midland might be tracking his phone activity, and therefore intentionally bothering him rather than trying to find Adams.  (Response to SOF ¶ 20.)  Arora considered that Midland might be harassing him at the behest of some other player, such as the FBI or Secret Service. (*Id.* ¶¶ 16–17, 20.)  At the same time as the "frequent and intrusive" calls from Midland (and other debt collectors), Arora experienced "difficulty sleeping, digestive issues, irritability, [and] headaches[.]"  (*Id.* ¶¶ 22–23.)  Arora never sought medical care for any of these conditions.

(Response to SOF ¶ 19.)  Arora also claims to have been diagnosed with "essential hypertension" but has not adduced any competent evidence of that diagnosis.  (Response to SOAF ¶ 21.)[2]

Arora claims that these emotional issues spilled over into his work.  (*Id.* ¶¶ 24–26.) According to Arora, Midland's calls made him irritable and unfocused, which caused him to lose an existing client, abandon development of a potentially lucrative new product, and lose out on a prospective consulting client.  (*Id.*)

### III.  Procedural History

Arora, through prior counsel, filed a one-count complaint in July 2015, alleging that Midland and Funding violated the Telephone Consumer Protection Act ("TCPA").  (Complaint (Dkt. No. 1).)  Later that month, the case was transferred to a multidistrict litigation ("MDL") of TCPA suits against Midland in another district "for consolidated pre-trial discovery related to common issues shared by all parties to the MDL."  (Report and Recommendation (Dkt. No. 39) at 7 (citing Dkt. No. 10).)  Arora fired his attorneys during the MDL and voluntarily participated in the MDL discovery process *pro se*.  (*See* Motion to Withdraw, *In re Midland Credit Mgmt., Inc., Tel. Consumer Prot. Act Litig.*, No. 3:11-md-02286-MMA-MDD (Dkt. No. 358) at 3 (S.D. Cal. June 10, 2016).)

In the MDL, Arora and hundreds of other plaintiffs took discovery about Midland's telephone dialing practices and technology for nearly two years.  (Response to SOAF ¶ 31.) During MDL discovery, a Midland representative sat for a deposition under Federal Rule of Civil Procedure 30(b)(6) about Midland's dialing technology and practices.  (Exhibit 5: Deposition of MCM's Charla Johnson ("Midland Dep.") (Dkt. No. 99-5).)  The MDL court

---

[2] Arora protests in his Sur-Reply that he disclosed the doctor's name, and Midland could have deposed the doctor.  (Sur-Reply at 5.)  But Arora, not Midland, bears the burden of proving his damages.  *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 628 (7th Cir. 2014).

further granted the plaintiffs leave to depose Noble within a reasonable timeframe. (Exhibit 19: MDL Dkt. No. 726 ORDER ("MDL Noble Dep. Order") (Dkt. No. 99-19) at 6.) But "[t]he deposition[] of Noble . . . did not proceed and no party asked that the date[] for [that] deposition[] be extended." (Exhibit 21: MDL Dkt. No. 811 ORDER ("MDL Discovery Close Order") (Dkt. No. 99-21) at 7.) About six months after the deadline to depose Noble, Arora moved for leave to depose and take written discovery from Noble, which the magistrate judge overseeing MDL discovery denied as untimely. (*Id.* at 10.) Arora objected to the magistrate judge's order, raising different arguments from his initial motion, and the district court overruled his objection. (Order Overruling Objection by Plaintiff Arora, *In re Midland Credit Mgmt., Inc., Tel. Consumer Prot. Act Litig.*, No. 3:11-md-02286-MMA-MDD (Dkt. No. 827) at 9–12 (S.D. Cal. Nov. 5, 2020).)

The case returned to us in March 2021. (Conditional Remand Order (Dkt. No. 14).) Given the age of the case and Arora's ample opportunities for discovery in the MDL, the magistrate judge set a discovery schedule ending on August 2, 2021. (Dkt. No. 23.) The magistrate judge reminded the parties that they "should not delay discovery," cautioning that "[w]e live in a world of deadlines . . . ." (*Id.* (quoting *Raymond v. Ameritech Corp.*, 442 F.3d 600 (7th Cir. 2006)).) Arora, still proceeding *pro se*, (*see* Initial Joint Status Report (Dkt. No. 19) at 1), moved to file a First Amended Complaint that added seven new counts and fifty-one new defendants. (Motion for Leave to File the First Amended Complaint and Memorandum in Support (Dkt. No. 24).) He alleged, among other things, that the unwanted phone calls constituted violations of the Racketeer Influenced Corrupt Organizations Act, civil conspiracies, and hate crimes. (Proposed First Amended Complaint (Dkt. No. 24-1) ¶¶ 72–146.)

On June 18, 2021, and while the motion for leave to amend was pending, Arora served notice of a Rule 30(b)(6) deposition, identifying topics that included information about Adams. (Notice of Deposition ("First 30(b)(6) Notice") (Dkt. No. 34-1).) Midland objected to the 30(b)(6) notice on June 24. (Objections to Notice of Deposition ("First 30(b)(6) Objections") (Dkt. No. 34-2).) Arora conferred with Midland two weeks later, on July 8 (Certificate of Compliance with Local Rule 37.2 (Dkt. No. 34-6) at 1), yet waited nearly a month until the day fact discovery closed, August 2, to move to compel a deposition. (Motion to Compel Depositions and Memorandum in Support ("First Motion to Compel") (Dkt. No. 34).) Arora noted in his First Motion to Compel that he "expect[ed] to file a separate motion to compel responses to written discovery," (*id.* at 1), but he never filed one.

On August 12, the magistrate judge recommended granting Arora leave to file new TCPA, FDCPA, and intrusion-upon-seclusion claims, but not RICO, conspiracy, or hate-crime claims. (Report and Recommendation (Dkt. No. 39) at 9.) Two weeks later, the magistrate judge denied Arora's motion to compel, ruling, among other things, that information about Adams was irrelevant to Arora's TCPA claims. (Memorandum Opinion and Order (Dkt. No. 47) at 5–6.) Arora did not seek review of either ruling. (Dkt. No. 48.)

After we adopted the magistrate judge's recommendation to grant Arora leave to file additional claims (Dkt. No. 48), Arora filed his Amended Complaint, asserting six claims for relief: (1) TCPA violations (First Amended Complaint (Dkt. No. 49) ¶¶ 66–80); (2) willful and knowing TCPA violations (*id.* ¶¶ 81–91); (3) FDCPA § 1692b & § 1692c violations (*id.* ¶¶ 92–98); (4) FDCPA § 1692d violations (*id.* ¶¶ 99–113); (5) FDCPA § 1629f violations (*id.* ¶¶ 114–122; and (6) intrusion upon seclusion (*id.* ¶¶ 123–35). Because fact discovery remained closed despite Arora's new claims, the parties jointly sought leave to reopen discovery for 60 days to

take discovery only concerning "the newly asserted allegations in Plaintiff's First Amended Complaint." (Joint Motion to Reopen Fact Discovery and Reset Discovery Schedule ("Motion to Reopen") (Dkt. No. 52) at 3.) The magistrate judge granted the motion and set December 5, 2021, as the deadline for all fact discovery to be completed. (Dkt. No. 53.)

There is nothing in the record to suggest that Arora served any interrogatories, requests for production of documents, or third-party subpoenas during the time discovery was re-opened. If he did, he never moved to compel responses. As far as the docket reveals, Arora sought discovery on his five new claims from a single source: a Rule 30(b)(6) deposition of Midland. (Exhibit 1: Notice of Deposition ("Second 30(b)(6) Notice") (Dkt. No. 57-1).) Arora's Rule 30(b)(6) notice sought, in relevant part, inquiry about "the debt and debtor regarding whom Defendants assert they had called [Arora's] cell phone number . . . ." (Second 30(b)(6) Notice at 2–3.) Midland objected to providing a witness on this topic because "the Court has already ruled against Plaintiff's request to obtain information regarding 'the debt and the debtor.'" (Exhibit 2: Defendants' Objections to Notice of Deposition ("Second 30(b)(6) Objections") (Dkt. No. 57-2) at 2–3.) Arora moved to compel, specifying that he sought information about whether Adams's debt was a "debt" as defined under the FDCPA, meaning that it was incurred primarily for "personal, family, or household purposes." (Motion to Compel Depositions and Memorandum in Support ("Second Motion to Compel") (Dkt. No. 57) at 5–7); *see* 15 U.S.C. § 1692a(5). The magistrate judge denied Arora's motion, (Dkt. No. 62), but we sustained Arora's objection in part, holding that Arora was entitled to some discovery into the nature of Adams's debt. (Feb. 7, 2022 Order (Dkt. No. 71) at 3–8.) Given Defendants' unsworn assertion that they had no information about the debt, we held that Defendants could either "provide a declaration complying with 28 U.S.C. § 1746 that attests to that Defendant's lack of knowledge regarding

the Subject Debt's purpose and the reasons for this lack of knowledge" or sit for Rule 30(b)(6) depositions. (*Id.* at 6–7.)

Defendants chose the former path and submitted sworn declarations stating that Adams's debt was originally owed to Navy Federal Credit Union, which then sold the debt to Asset Acceptance, LLC, which then sold it to Funding. (Declaration of Midland Credit Management, Inc. (Dkt. No. 73-1) at 3 ¶ 4.) Defendants' representative further declared that

> From the records in MCM's file relating to the Subject Account, [Midland] cannot determine whether the Subject Debt was incurred primarily for "personal, family, or household purposes." 15 U.S.C. § 1692a(5). More specifically, [Midland] does not have in its possession documents related to the Subject Account which show the types of charges that gave rise to the Subject Debt, the items purchased that led to the Subject Debt, or where the purchases were made.

(*Id.* at 3 ¶ 5.)

After receiving Defendants' declarations, Arora moved in March 2022 to compel Defendants to produce twelve new categories of documents. (Motion to Compel ("Third Motion to Compel") (Dkt. No. 79) at 2–3.) Arora did not claim that Defendants had wrongfully refused a valid discovery request; rather, he simply "believe[d] Defendants [we]re likely to have additional facts . . . ." (*Id.* at 2.) Finding that Arora's request for "yet more discovery into twelve additional topics" was "not an option allowed by the plain language of" our February 7, 2022 order, the magistrate judge denied Arora's motion. (Memorandum Opinion and Order (Dkt. No. 82) at 2.) Arora did not seek review of that order.

With discovery finally closed, Defendants' motion for summary judgment followed.

## LEGAL STANDARD

Summary judgment is appropriate "where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Giles v. Godinez*, 914 F.3d

1040, 1048 (7th Cir. 2019). In determining whether to grant summary judgment, "we construe all facts in the light most favorable to the" non-moving party "and draw all reasonable inferences in that party's favor." *Wehrle*, 719 F.3d at 842. The movant "has the initial burden of demonstrating there is no genuine dispute of material fact." *Bunn v. FDIC*, 908 F.3d 290, 295 (7th Cir. 2018). If this initial burden is met, the non-moving party must then set forth specific facts establishing a genuine issue of material fact. *Id.* A genuine issue of material fact exists "'only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quoting *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007)).

## ANALYSIS

### I.    Funding's Liability

Arora has acknowledged that Funding did not place any phone calls to him and has stipulated that Funding was not a "debt collector." (Response to SOF ¶¶ 3–6; Stipulation (Dkt. No. 92-1) at 2.) Funding is therefore not liable under any of Arora's claims for relief: the TCPA requires evidence that the defendant "ma[de] any call," 47 U.S.C. § 227(b); the FDCPA creates liability for conduct by a "debt collector," 15 U.S.C. § 1692k; and Funding could not have intruded upon Arora's seclusion without ever placing phone calls to or otherwise interacting with him. Thus, Funding is entitled to summary judgment on Arora's claims independent of all the reasons described below.

### II.    TCPA

The Defendants argue that they did not violate the TCPA because they did not use an automatic telephone dialing system, or "autodialer." (Memo at 6–9.) The TCPA prohibits

> any person within the United States . . . [from] mak[ing] any call (other than a call
> made for emergency purposes or made with the prior express consent of the called

party) using any *automatic telephone dialing system* . . . to any telephone number assigned to a . . . cellular telephone service . . . unless such call is made solely to collect a debt owed to or guaranteed by the United States . . . .

47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added).  There is no dispute that Midland (1) made calls; (2) to a telephone number assigned to a cellular telephone service; (3) without Arora's consent and for non-emergency purposes; (4) and not solely to collect a federal debt.

The TCPA defines an autodialer as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).  This definition "requires that an [autodialer] have the capacity" to generate or store or produce telephone numbers using a random or sequential number generator, "even if that capacity is not deployed for practical reasons." *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 939 (N.D. Ill. 2018).[3]  "Congress' definition of an autodialer requires that in all cases, whether storing *or* producing numbers to be called, the equipment must use a random or sequential number generator."  *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1170 (2021) (emphasis added); *see also Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 468–69 (7th Cir. 2020) (using the same interpretation before *Facebook*).

Defendants argue that there is no evidence in the record that the dialing systems they used can store or produce telephone numbers using random or sequential number generators. (Memo at 6–9.)  Arora offers inadmissible evidence in rebuttal, predicated mostly on documents from the internet, interpreted through the lens of his personal expertise.  (Opp. at 3–9.)

We agree with Defendants that Arora lacks competent evidence that Midland's dialing technology could store or produce phone numbers using a random or sequential number

---

[3] Although Midland asserts that it would never call phone numbers at random (as that would not help it collect debts) (Memo at 7–8), this assertion speaks to the equipment's actual use, not its capacity.

generator.  There appear to be three potentially admissible pieces of evidence in the record that discuss the nature of Midland's dialing systems.  First, Midland's 30(b)(6) deposition from the MDL established that Midland used the Noble system when Midland called Arora and described the basic operation of the system.  (Response to SOAF ¶ 30; Midland Dep. at 4–5, 10–13.) Second, Midland produced a written summary of the Noble dialing system in the MDL, which Arora could conceivably admit as the statement of a party-opponent under Federal Rule of Evidence 801(d)(2).  That summary is no help to Arora, however, because it establishes that the Noble systems did "not use, or have the capacity to use, a random or sequential number generator" (Written Description at 2)—in other words, that the Noble systems were *not* autodialers.  Third, Midland produced a 422-page manual of Noble's dialing technology in the MDL.  The Noble Manual merely supports Arora's basic description of the Noble technology: a user manually inputs phone numbers into a database, a user manually creates tables from the database, and the Noble technology automatically dials those non-random, non-sequential phone numbers from the tables.  (*Id.* at 129–38.)  Nothing in the Noble Manual establishes that the Noble system can use a random or sequential number generator to produce or store phone numbers.  (*Id.*)  Because the TCPA's definition of autodialer, as interpreted in *Facebook*, "excludes equipment that simply dials numbers from a stored list or database," Midland is entitled to summary judgment.  *Watts v. Emergency Twenty Four, Inc.*, No. 20 C 1820, 2021 WL 2529613, at *2 (N.D. Ill. June 21, 2021).

We either reject or cannot consider Arora's attempts to go beyond the admissible evidence.  First, Arora argues that Midland's dialing system is close enough to autodialing technology patents that existed in the 1970s and 1980s that it should qualify as an autodialer under the TCPA.  (Opp. at 4–7; Exhibit 16: Sequential Number Dialer (US Patent No. 3943289)

(Dkt. No. 99-16); Exhibit 17: Sequential Number Dialer (US Patent No. 4188510) (Dkt. No. 99-17); Exhibit 18: Random Number Dialer (US Patent No. 4741028) (Dkt. No. 99-18).)  We agree with Midland that these patents are "patently irrelevant."  (Reply at 8.)  We interpret the TCPA using the statute's words and court interpretations of those words, not by considering technology Congress might have known when it passed the law.  47 U.S.C. § 227(a)(1) (express statutory definition of ATDS); *Facebook*, 141 S. Ct. 1163; *cf. INTL FCStone Fin. Inc. v. Jacobson*, 950 F.3d 491, 499 (7th Cir. 2020) ("[W]e cannot . . . place a law's purpose above its text.").

Second, Arora argues that based on his personal expertise, theoretical understanding, and private experimentation with databases, he believes that the database from which Noble system pulls phone numbers could be manipulated to produce and store sequential numbers.  (SOAF ¶¶ 35–37.)  As explained above, Arora cannot create a genuine issue of material fact based on a previously undisclosed expert opinion using private experimentation.  We do not consider Arora's explanations of how the admissible evidence—which discloses no sequential number generating capacity—could be retooled to generate numbers sequentially.

Midland is entitled to summary judgment on Counts 1 and 2 of the Amended Complaint.

**III.   FDCPA**

Arora accuses Midland of violating Sections 1692b, 1692c, 1692d, and 1692f of the FDCPA.  (Amended Complaint ¶¶ 92–122.)  The protections provided in these sections "apply only to consumer debts, which the [FDCPA] defines as any obligation to pay money 'arising out of a transaction' entered into 'primarily for personal, family, or household purposes.'"  *Woods v. LVNV Funding, LLC*, 27 F.4th 544, 548 (7th Cir. 2022) (quoting 15 U.S.C. § 1692a(5)).  Thus, "[t]o make out a cause of action under the FDCPA . . . a plaintiff must offer evidence permitting a jury to conclude that the debt at issue falls within this statutory definition."  *Id.*  This

requirement applies even where the plaintiff did not incur the debt.  *Id.* "A jury need only find it more likely than not that the [debt] was a consumer debt."  *Id.* at 548–49.

Midland argues that Arora cannot prove that Midland was attempting to collect a consumer debt from Adams.  (Memo at 10–11.)  Arora responds that there is sufficient evidence for a jury to find that Adams's obligation was a consumer debt under the FDCPA, even though he concedes that he "is unable to state the purpose of the Subject Debt with absolute certainty" and "there was no possible way for Plaintiff to know or infer the purpose of the debt except through discovery," which he posits that Midland withheld.  (Opp. at 9–15.)

Viewing the record most favorably to Arora, there is insufficient evidence from which a jury could find that Midland took any action "in connection with the collection of any debt" under the FDCPA.  The competent and relevant evidence in the record establishes that Adams incurred her debt to Navy Federal Credit Union, which was ultimately sold to Funding.  (SOF ¶¶ 10–11.)  Midland and Funding, however, have sworn that they have no records from which they can determine the nature of Adams's debt.  (Midland Dec. ¶¶ 3–5; Funding Dec. ¶¶ 3–5.)  Arora did not seek discovery from anyone else on the subject—or, if he did, he did not seek to compel its production.  With nothing in the record showing the purpose of Adams's debt, no reasonable factfinder could determine that it was a consumer debt.

To overcome the dearth of competent evidence, Arora relies on a combination of inadmissible evidence and insufficiently supported inferences.  Arora argues that Navy Federal Credit Union advertises a personal loan on a page that Arora purports to be its website, but the page is used as hearsay that Arora cannot authenticate.  (Exhibit 15: NFCU Personal Loans (Dkt. No. 99-15).)  Arora also argues that someone else told him that Adams was born in 1989, which is hearsay when used to prove Adams's age.  (Arora Dec. ¶ 22.)  He further posits that the

address T-Mobile disclosed in the MDL as associated with Adams's account is on a U.S. Naval

base, for which he cites no evidence whatsoever. (Opp. at 15.) Finally, he cites the Form 10-K

filing of Midland and Funding's ultimate parent company, Encore Capital Group, Inc., which

states that Encore's portfolio consists of "consumer" debt. (Exhibit 14 at 15.) Arora might be

able to authenticate this document, *see* Fed. R. Evid. 902(4) (certified copies of "document that

was . . . filed in a public office" are self-authenticating), but it is still hearsay—an out-of-court

statement of a nonparty offered for its truth.

But even if we considered all this evidence, it would not suffice to create a genuine issue

of material fact. Though a jury can determine the purpose of a debt circumstantially, it must

have a factual basis to do so. *Woods*, 27 F.4th at 548–49. In *Woods*, for instance, the plaintiff

introduced evidence that the third party incurred the original debt to purchase a one-way plane

ticket. *Id.* The Seventh Circuit held this sufficed to create a genuine issue of material fact

because a jury could find that a one-way ticket was more likely to be for personal rather than

business purposes. *Id.* at 549. Arora, on the other hand, has no evidence of the purchases for

which Adams incurred the debt, even if we considered his inadmissible evidence and his bald

assertions. Arora could show only that a person born in 1989 borrowed money from an

institution that offers some personal loans, possibly while serving in the Navy. This would not

permit a reasonable factfinder to conclude that the debt was a consumer debt. *See Burton v.

Kohn Law Firm, S.C.*, 934 F.3d 572, 584 (7th Cir. 2019) (credit card statements showing

purchases at gas stations, convenience stores, office supply and auto parts stores, pizza

restaurant, and local school district insufficient to establish that debt was personal). Even the

hearsay statement that Encore's portfolio contains "consumer" debt would not suffice, because

the Seventh Circuit has held that such a characterization is insufficient to prove a consumer debt

under the FDCPA. *Id.* at 582 ("Mr. Burton also invites our attention to evidence that [defendants] advertised their services collecting consumer debt on their websites. However, the defendants' marketing materials generally describing their debt collection services do not establish that the debt they attempted to collect *in this case* was a consumer debt.")

Midland is entitled to summary judgment on Counts 3 through 5 of the Amended Complaint.

## IV. Intrusion Upon Seclusion

Midland next argues that Arora lacks sufficient evidence to sustain his claim for the tort of intrusion upon seclusion. (Memo at 11–13.) The elements of intrusion upon seclusion under Illinois law are: (1) an unauthorized intrusion into a plaintiff's seclusion; (2) the intrusion would be "highly offensive or objectionable to a reasonable person"; (3) the matters upon which the intrusion occurred were private; and (4) the intrusion caused anguish and suffering. *Messina v. Green Tree Servicing, LLC*, 210 F. Supp. 3d 992, 1008–09 (N.D. Ill. 2016) (quoting *Cooney v. Chi. Pub. Schs.*, 407 Ill. App. 3d 358, 366 (1st Dist. 2010)). To establish the fourth element of "anguish and suffering," "the plaintiff must prove actual injury in the form of, for example, medical care, an inability to sleep or work, or a loss of reputation and integrity in the community. Injury is not presumed." *Id.* at 1009 (cleaned up). "Additionally, a causal relationship between plaintiff's anguish and defendant's alleged intrusion must be established." *Id.* Midland argues that Arora cannot prove the fourth element because he cannot show either "actual injury" or that Midland caused it. (Memo at 11–13.) Arora responds that he has shown a variety of ailments and loss of business caused by Midland's phone calls. (Opp. at 19–20.)

Citing *Messina*, Midland argues that Arora cannot establish "anguish and suffering" unless he offers evidence "other than his own say-so." (Memo at 11.) In *Messina*, a debt

collector placed 250 phone calls to a purported debtor and two of her children, all three of whom sued for intrusion upon seclusion. 210 F. Supp. 3d at 996–97. The children's only evidence of anguish and suffering were their generic declarations that they felt "annoyed, aggravated and upset" or "harassed, abused and oppressed." *Id.* at 1009. Their declarations offered no evidence whatsoever of causation. *Id.* The district court held those declarations insufficient to prove anguish and suffering. *Id.*

But the district court ruled that the purported debtor's intrusion claim survived because she "offered additional evidence as to the anguish and suffering she endured," and created "at least a question of fact as to whether [the defendant's] alleged intrusion was the proximate cause of her anguish and suffering." *Id.* A review of the record in that case reveals that the debtor, too, relied primarily on her own declaration. Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts & Statement of Additional Material Facts, *Messina v. Green Tree Servicing, LLC*, No. 14-cv-7099 (Dkt. No. 108) at 19 ¶ 39. The "additional evidence" was her more specific allegations of concrete harm—"migraines, anxiety, panic attacks, chest pains, loss of appetite, [and] sleepless nights"—plus documentary evidence of medical expenses for some of those ailments. *Id.*; Teresa Messina's Declaration in Opposition to Motion for Summary Judgment, *Messina v. Green Tree Servicing, LLC*, No. 14-cv-7099 (Dkt. No. 108-2) at 11 ¶¶ 35–37.

Also instructive is *Schmidt v. Ameritech Illinois*, 329 Ill. App. 3d 1020 (1st Dist. 2002), which thoroughly analyzed the "anguish and suffering" requirement in *dicta*.[4] In *Schmidt*,

---

[4] Our task when reviewing a supplemental state-law claim is to interpret Illinois law as we expect the Illinois Supreme Court would interpret it. *Chrysler Realty Corp. v. Thomas Indus., Inc.*, 97 F. Supp. 2d 877, 879 (N.D. Ill. 2000). We find that the Illinois Supreme Court likely would agree with the Illinois Appellate Court's thorough and well-reasoned interpretation of the

Ameritech suspected that one of its employees took a fishing vacation while on paid disability leave, and to prove it, Ameritech searched through his personal phone records and the business phone records of the salon where his wife worked. *Id.* at 1023–26. Ameritech fired the employee. *Id.* at 1026. The employee, his wife, and the salon owner sued for intrusion upon seclusion. *Id.* At trial, the employee testified that he and his wife were depressed after Ameritech fired him. *Id.* at 1034–35. The salon owner testified that she felt "infuriated" when she discovered that Ameritech probed her phone records, which caused her and her employees to use her work phone for personal calls less. *Id.* at 1035–36. None of the plaintiffs sought medical or psychological care. *Id.* at 1035–36.

The jury awarded damages to each plaintiff. *Id.* at 1026. The Illinois Appellate Court reversed, holding that the plaintiffs had not proven that the intrusion was unauthorized. *Id.* at 1031–34. But because the intrusion-upon-seclusion tort was "relatively untested" at the time, the *Schmidt* court "ch[o]se to address the remaining issues," including the evidence required to establish the "anguish and suffering" element. *Id.* at 1034–36. The court explained that while the employee and his wife could not prove *causation* of anguish and suffering—because the employee's termination, rather than the intrusive review of phone records, caused their depression—the salon owner's damages "[we]re substantiated by the evidence." *Id.* at 1036–37. Her own testimony that she "changed her own phone use and the phone use of her business and staff" and that she "was infuriated and emotionally upset" sufficed. *Id.* at 1036–37.

Arora's testimony about his emotional and psychological well-being is most like the evidence found sufficient in *Schmidt* and *Messina*. Unlike the children in *Messina*, who claimed

---

"anguish and suffering" element in *Schmidt*. Indeed, the Illinois Supreme Court has approved of *Schmidt* on other issues. *E.g.*, *Lawlor v. N. Am. Corp. of Ill.*, 2012 IL 112530 ¶¶ 34–35.

generic unpleasant feelings, Arora swears that his emotional injuries manifested physically through headaches and loss of sleep, just like the debtor in *Messina*. Arora's declaration covers concrete symptoms within his own personal knowledge: "difficulty sleeping, digestive issues, irritability, [and] headaches . . . ." (Arora Dec. ¶ 16.) Both *Schmidt* and *Messina* identify "loss of sleep" as exactly the sort of "actual damages" that could establish "anguish and suffering." *Schmidt*, 329 Ill. App. 3d at 1035 (including "inability to sleep" as an example of "actual injury"); *Messina*, 210 F. Supp. 3d at 1009 (same). His own say-so is enough for this type of injury. *Schmidt*, 329 Ill. App. 3d at 1035–36 (holding salon owner's testimony would have sufficed to support her damages); *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, No. 22-1708, 2022 WL 17829283, at *10 (7th Cir. Dec. 21, 2022) ("[S]eeking treatment is not a mandatory condition to establish harm . . . .").

Midland next argues that Arora cannot prove causation because his damages, if any, were caused by his worry about a conspiracy against him, rather than Midland's phone calls. (Memo at 12–13.) A jury could find that Midland's phone calls caused his injuries. Arora testified that he was distressed over Midland's phone calls in part because they were so frequent and suspiciously timed that he believed Midland was trying to target Arora, despite its claim that it sought Adams. (Response to SOF ¶ 20.) Because Midland—a debt collector to whom he owed no debt—had no reason to target Arora, he assumed that it acted at the behest of someone else who might wish him ill, possibly a federal agency. (*Id.* ¶¶ 16–17, 20.) However far-fetched his theory about Midland's motives, the crux of Arora's claim is still that Midland's phone calls caused his injuries. (*Id.*; Arora Dec. ¶¶ 16–17.) That distinguishes this case from *Schmidt*, where the plaintiff's testimony affirmatively established that something other than the defendant's intrusion—the employee's termination—caused the employee and his wife to feel

depressed. *Schmidt*, 329 Ill. App. 3d at 1034–35. Arora has also provided evidence of causation that the children in *Messina* did not provide, as he has both declared that his symptoms abated after Midland stopped calling and testified that he would suffer headaches right after Midland called him. (Arora Dec. ¶¶ 16–17 (averring that symptoms occurred "December 2013 through July 2014," when Midland called him); *see also* Arora Dep. at 44 ("[T]hese calls used to make me really angry and that's when I would start getting the headache.").) That is sufficient for a jury to infer causation—whatever Midland's motives for making the phone calls, Arora's symptoms occurred while Midland called him and abated when Midland stopped calling him.

Because there is a genuine dispute about whether Midland's calls caused anguish and suffering, Midland's motion for summary judgment is denied as to Count 6 of the Amended Complaint. Although we deny summary judgment on this claim, we clarify the scope of damages from the purported intrusion that Arora could pursue. Arora asserts many emotional and physiological damages that he can prove with his own testimony, but he also asserts that Midland's phone calls caused him to develop "essential hypertension," based on a doctor's diagnosis. Arora never produced any medical records supporting that claim, either in discovery or in response to the motion for summary judgment. (Response to SOF ¶ 19.) As explained above, a nonparty doctor's out-of-court statement that Arora experienced or stopped experiencing hypertension is hearsay when used for its truth. What little Arora has filed that did not come directly from himself is inadmissible and insufficient—unauthenticated, hearsay printouts purportedly from WebMD that show, at most, that stress can contribute to high blood pressure. (Exhibit 4: WebMD on Hypertension (Dkt. No. 92-4); Exhibit 5: WebMD on Stress (Dkt. No. 92-5).) Arora cannot claim medical expenses or damages based on diagnoses he could not prove at trial.

Midland also asserts that Arora's financial damages are speculative. (Memo at 14.) Midland cites no authority for this argument either in its memorandum or its reply and therefore has forfeited this undeveloped argument. (*Id.*; Reply at 13); *Est. of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005). Although we do not grant this portion of Midland's motion, it appears that Arora's claimed financial damages do not seem concrete because he did not answer all discovery requests related to those damages. (*See* Arora Dep. at 35 ("Q. Was this contract written? A. Yes. Q. Did you produce it? A. No."); *id.* at 36–37 (Arora failing to name the client whose contract cancellation he claims as damages or the names of individuals who might have knowledge of the cancellation); *id.* at 37 ("Q. . . . [I]f that is going to form any of the basis for damages in the case I will ask for that to be produced. A. Okay. Q. Okay. So do you plan on producing that? A. I'm going to consult an attorney whether I can claim damage on that or not."); *id.* at 38–39 (Arora refusing to produce documents corroborating his asserted annual income).) This may limit his ability to present evidence of financial damages at trial. *See* Fed. R. Civ. P. 37(c)(1) (prohibiting party from relying on evidence not disclosed in discovery); Fed. R. Civ. P. 37(b)(2)(A)(i)–(vi) (outlining other potential sanctions for failure to disclose information during discovery). We will entertain motions *in limine* in due course.

Midland's motion for summary judgment is denied as to Count 6 of the Amended Complaint.

## V. Motion to Reopen Discovery

At several points, Arora candidly acknowledges his lack of evidence about Midland's dialing technology and the nature of Adams's debt and seeks leave to take more discovery, even though discovery closed long ago. (*E.g.*, Opp. at 11 ("[A]dditional disclosures are needed for greater certainty"); *id.* at 12 ("Plaintiff believes Defendants should disclose all of the relevant

facts in their possession . . . ."); Response to SOF ¶ 12 ("Plaintiff requests that [Midland] be required to produce all relevant information in its possession . . . .  Plaintiff requests deposition of Defendants' declarant Jennifer Pariseau regarding this issue."); *id.* ¶¶ 13–15 (responding to each statement in this range that "additional discovery is required regarding this issue.").)  We construe these as requests to reopen discovery and deny them.

Arora was given many opportunities to take the discovery he now requests but simply did not take advantage of them.  Arora actively participated in the MDL discovery process into Midland's TCPA practices for years.  (Response to SOAF ¶ 31.)  During that process, he and other plaintiffs took a Rule 30(b)(6) deposition of Midland about its dialing practices.  The MDL plaintiffs, including Arora, were expressly granted leave to depose Noble but failed to do so.  (MDL Noble Dep. Order at 6; MDL Discover Close Order at 7.)  Arora insists that written discovery was concealed or withheld from him in the MDL, unfairly denying him the opportunity to depose or obtain written discovery from Noble.  (*E.g.*, Sur-Reply at 11.)  But the MDL magistrate and district judges reasonably determined that Arora improperly waited approximately six months after the deadline for depositions to raise these arguments.  (MDL Discovery Close Order at 10; MDL Order Overruling Objections at 9–12.)  Arora could have objected to the deadlines or requested an extension before they transpired, but instead he waited many months to raise the issue.

Arora has similar complaints about discovery management in this action, but his lack of diligence follows a similar pattern.  Once this case returned to us, Arora prioritized his motion to expand his TCPA case into a sprawling conspiracy claim against Midland, T-Mobile, and 50 John Does, placing discovery on the back burner for several months.  (Dkt. No. 23; Motion for Leave to Amend; Proposed First Amended Complaint.)  As the magistrate judge aptly described

Arora's lack of urgency: "the plaintiff did not seek the depositions he claims he needs until two months after my Order [setting a discovery close date]. And, once the defendants—who had already been through MDL discovery—rather predictably objected, plaintiff not only waited another month to file his motion, but did so on the afternoon discovery closed." (Memorandum Opinion and Order (Dkt. No. 47) at 3.) Because Arora did not seek relief until the day that discovery closed, he missed his opportunity to compel a Rule 30(b)(6) deposition. (First Motion to Compel; Dkt. No. 47 at 5–6); *see Signal Fin. Holdings LLC v. Looking Glass Fin. LLC*, No. 17 C 8816, 2021 WL 4940865, at *4 (N.D. Ill. June 10, 2021) (denying motion to compel filed on the day discovery closed).

Moreover, Arora now seeks to obtain documents to probe Midland's sworn statement that it has no information concerning the purposes for which Adams incurred her debt. But Arora did not timely move to compel production of those—or any other—documents. (First Motion to Compel at 1 (referencing that he would move to compel written discovery later, but never filing a motion); Second Motion to Compel at 1 (requesting to compel only 30(b)(6) deposition).) Instead, he sought *only* a Rule 30(b)(6) deposition of Midland, but after Defendants responded that their representative would have no information, we allowed them to submit a sworn declaration in lieu of sitting for depositions where they would testify to the same lack of knowledge. (Feb. 7, 2022 Order (Dkt. No. 71) at 6–7.) Arora did not move to compel the production of documents until several months after the close of discovery. (Third Motion to Compel at 2–3.) And he did not claim, as he had to, that Defendants "fail[ed] to produce documents . . . as requested under Rule 34," Fed. R. Civ. P. 37(a)(3)(B)(iv), but rather that he thought more documents he had not requested existed, and he wanted them now that discovery

had closed.  (*Id.* at 2.)  He cannot reopen discovery to obtain documents he could have but chose not to either request or compel Midland to produce while discovery was still open.

Finally, as Arora himself acknowledged, "[t]he original creditor is more likely to know whether the debt was personal or commercial at its incipience."  *Miller v. McCalla, Raymer, Patrick, Cobb, Nichols & Clark, L.L.C.*, 214 F.3d 872, 875 (7th Cir. 2000); (Third Motion to Compel at 2 (reciting this quotation).)  Arora could have sought third-party discovery from people and entities more likely than Defendants to know about the nature of Adams's debt, like Navy Federal Credit Union, but he did not.  Arora had tools at his disposal to seek answers to the questions he now poses but did not use them.

Because Arora failed to avail himself of the many opportunities afforded to him to obtain discovery, we are unwilling to reopen discovery for Arora yet again, seven years into this litigation.  Though we have afforded Arora some leeway, reopening and extending discovery multiple times, we cannot stretch the Federal Rules so far, to the Defendants' detriment.  We will not allow Arora to reopen discovery after the defendants filed a dispositive motion merely because the motion alerted Arora to his failure to seek key information from appropriate channels while discovery was open.  *See Johnson v. Thompson-Smith*, 203 F. Supp. 3d 895, 900 (N.D. Ill. 2016) (noting that although *pro se* litigants are treated leniently, they must comply with the rules).

## CONCLUSION

For the foregoing reasons, Defendants Midland Funding LLC and Midland Credit Management Inc.'s motion for summary judgment (Dkt. No. 83) is granted in part and denied in part.  All claims against Midland Funding LLC are dismissed.  Counts 1 through 5 against Midland Credit Management Inc. are dismissed.  Summary judgment is denied as to Count 6

against Midland Credit Management Inc.  The status date of January 12, 2023 is stricken and reset to March 16, 2023.  By March 2, 2023, the parties shall submit a joint status report concerning any settlement efforts and whether they believe a settlement conference would be productive.  It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: January 10, 2023